**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAVIST CHESTER, | ) | CASE NO. 5:22-CV-00954-SO |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| WARDEN DOUGLAS FENDER, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant, | ) | |

## I.      Introduction

Petitioner, Tavist Chester, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Chester is an Ohio prisoner who is currently serving a 23-year to 24-year to life sentence for murder and felonious assault. Chester asserts five grounds for relief. (ECF No. 1). Respondent, Warden Ed Sheldon, filed a return of writ on September 23, 2022. (ECF No. 5). Chester filed a traverse on December 30, 2022. (ECF No. 11, 12). Respondent filed a reply on January 13, 2023. (ECF No. 13).

This matter was referred to me under Local Rule 72.2 to prepare a report and recommendation on Chester's petition and other case-dispositive motions. Because Chester presents only non-cognizable and meritless claims, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

## II.     Relevant Factual Background

Chester is a former army service-member who was honorably discharged after three-and-a-half years of service. Following his time in the military, Chester worked as a mail carrier for the

1

United States Postal Service. At the time of the incident at issue here, Chester was working a full-time regular mail route. Chester was married, had a mortgage, and has three daughters. Prior to his convictions in this matter, Chester did not have a criminal record.

In February 2019, an incident occurred with an individual named Antonio Wallace, a known member of Canton's Shorb Blocc gang, at a different bar which ended with someone shooting at Chester's truck on Interstate 77 in Canton. A passenger in Chester's vehicle shot back. For the months following this incident, Chester received vague threats on behalf of Antonio Wallace, leading Chester to fear for his life. Chester began carrying a gun, a Smith & Wesson .40 caliber, on his mail route and kept an AK-47 hidden in his truck.

The Ohio Court of Appeals for the Eighth Appellate District set forth the following facts[1] on direct appeal:

> {¶2} This case arose in the early-morning hours of May 12, 2019, when appellant shot and killed Nigel Jackson outside the R Bar in Canton, Ohio. The following evidence is adduced from the record of appellant's jury trial.
>
> *Scene of shooting at the R Bar: suspect is identified*
>
> {¶3} Ptl. Vincent Romanin worked midnight shift with the Canton Police Department when he was dispatched to the R Bar at 1117 Wertz Avenue Northwest around 12:44 a.m. on May 12, 2019 for a shooting casualty. Upon arrival at the bar, Romanin found a chaotic scene outside with a crowd surrounding one man on the ground, unresponsive. Romanin observed the aftermath of what appeared to have been a shootout. Many shell casings were scattered in the parking lot and several parked cars sustained damage from gunshots.
>
> {¶4} Someone at the scene showed Romanin footage from a bar security camera. On the video, a silver late-model Dodge Ram pickup truck pulled up to the front of the bar. Romanin recognized this vehicle from an incident he was involved in months earlier: an exchange of gunfire occurred between vehicles on Interstate 77 in Canton. Someone at the bar provided appellant's name, and Romanin checked

---

[1] The facts found by the appellate court of record "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

for vehicles registered to appellant. One was a silver Dodge Ram pickup truck. Romanin forwarded this information to detectives.

{¶5} Sgt. Scott Prince investigated the shooting incident and learned the silver Dodge Ram at the crime scene was associated with appellant. Prince found the vehicle parked at appellant's residence. Prince knocked and appellant came to the door; Prince said only, "You know why I'm here. We need to talk." Prince asked appellant if the gun was still in the house, and appellant said no. Appellant gave consent to search the house, and no gun was found. Appellant was transported to Canton Police Department and interviewed by Prince and two other detectives.

*Security camera footage*

{¶6} Appellee presented videotape evidence from the bar to illustrate events leading up to the shooting. The evidence consisted of shots from multiple cameras and multiple perspectives. Appellant entered the bar with his cousins Courtney Compton and Jordan Smalls. Appellant and the women were inside the bar for only a short time when suddenly, unprovoked, Nigel Jackson struck appellant in the back of the head without warning.

{¶7} Appellant and his cousins ran from the bar. Jackson and Antonio Wallace exited the bar, and Jackson physically reacted as he was shot, crumpling to the ground. Wallace held a gun in his right hand and raised it. Appellant ran beside his truck, firing two shots. The video also shows two muzzle blasts from the door of the bar, later determined to have been fired by bar manager Joshua Moore.

{¶8} None of the weapons fired by any of the three individuals that night was recovered. Numerous shell casings were found of three separate calibers: .40, .45, and .380. Two bullets fragmented in Jackson's body; one entered his lungs and severed his spinal cord, but remained intact. The bullets which struck and killed Jackson were .40-caliber Smith & Wesson shells, copper-nosed bullets identical to those found under appellant's bed during the consent search of his residence.

{¶9} The remainder of the trial consisted of witnesses filling in their versions of the events captured on the bar security videos.

*The bar manager throws patrons out and fires gun into the air*

{¶10} Joshua Moore is a manager of the R Bar. On the weekend of May 11, the bar sponsored a Mother's Day event and was crowded. Moore worked the door, collecting cover charges, patting down patrons, and checking women's purses. He became aware that one of the bar's bouncers, "Franco," was attempting to break up a fight between appellant and Nigel Jackson. Moore grabbed Jackson; Jackson swung at him; and the two started to fight. Moore heard someone yell, "Get off my boy," and realized it was Antonio Wallace, with a gun in his hand. Moore told Wallace and Jackson to get out of the bar, along with a third unidentified man.

Wallace, Jackson, and their unidentified companion backed out of the bar, "jawing" with Moore as they left through the front door.

{¶11} Moore's eyes stayed on Wallace because Wallace had a gun in his right hand, his arms at his sides. When Wallace and Jackson reached the front of the bar, shooting started from the parking lot. Jackson crumpled and fell. Wallace dropped and tried to run. Moore either retrieved the "bar gun" himself, or asked another bouncer to retrieve it for him, and fired two shots into the air.

{¶12} Moore testified that when he heard the first shots ring out, Wallace's hands were still at his sides because he was still engaged with Moore. Moore saw Jackson fall to the ground before Wallace started shooting. Moore was the third and final shooter; his purpose in firing into the air was to scare people away from the scene. Several people in the crowd called 911. When police arrived on the scene, Moore retrieved the bar security video to show them. The "bar gun" he fired into the air was never turned over, however. Moore described the "bar gun" as a .45 caliber Taurus.

*Bouncer hears shots, sees Jackson fall, then Wallace fires*

{¶13} Samuel "Franco" Jamerson was the bouncer on duty with Moore that night. He was familiar with appellant and his cousins, and also with Wallace and Jackson. Wallace is a "regular" at the R Bar and generally sits on the patio, smoking with his "crew." That night, Jackson went in and out of the bar several times. Upon appellant's arrival, Franco chatted with him and his cousins, then sat down and turned away briefly. He was surprised to see Jackson come up behind appellant and "sucker-punch" him in the back of the head. Franco ran to grab Jackson, but not before Compton and Smalls jumped on him in defense of appellant.

{¶14} Franco grabbed appellant and pulled him toward the door of the bar. Joshua Moore came up and asked what happened. Franco told appellant he had to leave; appellant said "no problem" and ran toward the parking lot. Compton and Smalls also ran out of the bar shortly behind appellant. As Franco dealt with appellant, Jackson punched Moore, and Jackson and Moore began to fight. Wallace came up and told Moore something to the effect of, "Get the fuck off my boy." Wallace had a gun in his right hand, although his arms were at his sides. Wallace, Jackson, and another man walked to the door and Moore said they all had to get out.

{¶15} The three went out the door and Franco heard "boom, boom, boom." Franco watched Wallace, whose hands were still at his sides, pistol in hand. Jackson slowly dropped to the ground as Franco and Wallace also ducked. Due to the way Jackson crumpled, Franco surmised he was shot. Wallace raised his pistol and fired back.

{¶16} To Franco, it sounded like many rounds were fired. Franco was armed, but he did not shoot because he didn't know where the shots were coming from. Franco ran back into the bar, shut the door, and told panicked patrons to exit out the back

4

door. Wallace came back into the bar and pointed his weapon at Moore. Franco said, "You don't want to do that," and Wallace lowered the gun and ran back out the front door.

{¶17} Franco was the only participant in the night's events who voluntarily turned over his firearm to police, even though he didn't fire it that night and was not one of the shooters. At trial, Franco speculated that even though bar patrons were patted down and searched upon entering, Wallace could have obtained his pistol through the slats in the fence around the patio, which had been a problem in the past. Franco unequivocally testified that Wallace fired his gun after the first shots were fired in his direction from the parking lot and after Jackson had already been hit.

*Jackson killed by copper-nosed Inceptor bullet*

{¶18} A deputy medical examiner performed an autopsy on Jackson and found he had three gunshot entrance wounds. Two were nonfatal, one to the right corner of his mouth and one to his left upper arm. The bullets from both of those shots fragmented, or broke apart, and the medical examiner retrieved portions of copper-nosed bullets from the wounds. The third shot was a gunshot wound to Jackson's right chest which penetrated his lung and severed his spinal cord. This projectile was retrieved intact, also a copper-nosed bullet. This wound was fatal.

{¶19} Appellee's firearms expert testified that six .380 caliber shell casings were discovered at the scene, all fired from the same weapon. Police also found two .45 caliber shell casings, both fired from a second gun. Finally, several .40 caliber shell casings were found, including one in the bed of appellant's truck. All of the .40 caliber shell casings were fired from the same weapon, although some of the shells were of different brands. No firearms were recovered from the scene.

{¶20} During the consent search of appellant's residence, an ammunition box was found under his bed for .40 caliber Inceptor brand shells. Inside the box were six .40 caliber Smith & Wesson shells manufactured by Blazer, one of the brands of .40 caliber shell casings found at the scene. The intact bullet and bullet fragments recovered from Jackson's body were unique copper-nosed bullets manufactured by Inceptor for .40 caliber firearms.

*Appellant's testimony: in fear for his life of Antonio Wallace*

{¶21} Appellant testified on his own behalf at trial. He said in February 2019, an incident occurred with Antonio Wallace at a different bar which ended with someone shooting at appellant's truck on Interstate 77 in Canton. A passenger in appellant's vehicle shot back. Appellant testified this incident led to several months of vague threats on behalf of Antonio Wallace, leading appellant to fear for his life. Appellant started carrying a gun, a Smith & Wesson .40 caliber, on his mail route and kept an AK-47 hidden in his truck.

{¶22} On the evening of May 11, 2019, appellant went out with his cousins Compton and Smalls. Compton drove the three in appellant's truck to the R Bar. Appellant secreted his handgun on top of a tire in the wheel well of the parked truck while he went into the bar. The three entered the bar and were talking with Franco when appellant was suddenly struck from behind on the head. Appellant did not know Nigel Jackson and never saw him before. He thought Antonio Wallace struck him, although he testified he didn't see Wallace in the bar.

{¶23} Appellant ran out of the bar because he wanted to get away. He screamed to his cousins to run, too. Appellant arrived at the truck first, grabbed his weapon from the tire, but couldn't open the door because Compton had the keys. Rather than wait for his cousins who were shortly behind him, appellant ran back toward the bar parking lot because he claimed he thought he would be "safer" there. He knew the bar had security cameras. Appellant saw Wallace in front of the bar with a gun in his hand. Appellant claimed he saw Wallace point the gun in his direction, so appellant raised his own gun and immediately started shooting. Appellant later told police he "emptied his clip." He then ran away through some backyards, called Compton, and was picked up in his truck. Appellant claimed he didn't know anyone was shot until police told him he would be charged with murder. Appellant feared for his life because of Wallace and testified he does not believe he shot Jackson. He never saw anyone fall when shots were fired but doesn't know how many rounds he fired; he "was just squeezing."

{¶24} Upon cross examination, appellant said he saw Wallace outside the bar and thought Wallace was the person who hit him. He could not have left immediately after being punched because he had to retrieve his cousins from the bar. When he got to the truck, he couldn't get in and didn't see his cousins coming so he ran back to the parking lot. Appellant acknowledged he was likely to harm someone by pointing his gun at a group of people and firing, but claimed he only fired because someone was trying to hurt him.

*Appellant's cousin didn't see shots fired*

{¶25} Courtney Compton, appellant's cousin, testified on his behalf. She acknowledged she had the truck keys in her purse and said she and Smalls drove the truck back toward the bar looking for appellant but didn't see him. They heard shots but didn't see appellant and were afraid he was on the ground, dead. Appellant then called her and she picked him up a few blocks away from the bar. Compton's sister was inside the bar and called her to ask if everyone was O.K. because someone outside the bar was dead. Appellant didn't tell her he shot at anyone. He did, however, bring an AK-47 to her house after the shooting and asked her to keep it for him.

*State v. Chester*, 2021-Ohio-918, ¶¶ 2-25.

## III.    Relevant State Procedural History

6

A. **Indictment**

Appellant was charged by indictment with one count of aggravated murder pursuant to R.C. 2903.01(A) [Count I]; one count of murder pursuant to R.C. 2903.02(A) and/or (B) [Count II]; and three counts of felonious assault pursuant to R.C. 2903.11(A)(1) and/or (A)(2) [Counts III, IV, and V]. Each count was accompanied by a firearm specification pursuant to R.C. 2941.145.

*Id.*, 2021-Ohio-918, ¶26.

B. **Guilty Verdict & Sentence**

Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Appellant was found not guilty upon Count I, aggravated murder, and guilty upon the remaining counts of murder and felonious assault. The trial court sentenced appellant to an indefinite prison term of 23 to 24 years to life.

*Id.*, 2021-Ohio-918, ¶27.

C. **Direct Appeal**

On appeal, Chester raised three assignments of error:

1. The verdict is against the manifest weight of the evidence.

2. The verdict is insufficient as a matter of law.

3. The trial court's sentencing was in error, depriving Appellant of his Constitutional rights.

(ECF No. 5-1, Ex. 32, PageID #: 227). The State opposed Chester's assignments of error. (*Id.*, Ex. 33, PageID #: 255). On March 22, 2021, the appellate court overruled each assignment of error and affirmed the trial court's judgment. (*Id.*, Exs. 34-35, PageID #: 281-307; *Chester*, 2021-Ohio-918).

D. **Appeal to the Ohio Supreme Court**

On April 26, 2021, Chester appealed through counsel to the Ohio Supreme Court. (ECF No. 5-1 at Exs. 37, 37). Chester's memorandum in support of jurisdiction raised the following propositions of law:

> **Proposition of Law I:** Appellant's verdict is against the manifest weight of the evidence.
>
> **Proposition of Law II:** Appellant, Chester's conviction/verdict is insufficient as a matter of law.
>
> **Proposition of Law III:** The trial court's sentencing was in error, depriving Appellant, Chester of his Constitutional rights.

(ECF No. 5-1 at Ex. 37). On July 6, 2021, the Ohio Supreme Court declined jurisdiction. (ECF No. 5-1 at Ex. 38).

### E.  Ohio App. R. 26(B) Application for Reopening

On June 9, 2021, Chester, pro se, filed an application to reopen his direct appeal pursuant to Ohio App. R. 26(B). In his 26(B) application, Chester argued that his appellate counsel was ineffective for failing to raise the following assignments of error:

> 1. Appellate counsel was constitutionally ineffective for failing to assign as error, trial counsel's ineffectiveness as defense counsel failed to preserve on the record Chester's no duty to retreat (stand your ground) argument before the trial court.
>
> 2. Appellate counsel was constitutionally ineffective for failing to assign Chester's no duty to retreat argument under Ohio Criminal Rule 52(B), plain error.

(*Id*. at Ex. 39). The State filed a response in opposition. (*Id*. at Ex. 40). On October 13, 2021, the Court of Appeals for the Fifth Appellate District denied Chester's 26(B) application. (*Id*. at Ex. 41, Case No. 2020CA00028).

On November 22, 2021, Chester, pro se, timely filed a notice of appeal to the Supreme Court of Ohio. (*Id*. at Ex. 42) In his memorandum in support of jurisdiction, Chester set forth the following propositions of law:

> 1. Appellate counsel was constitutionally ineffective for failing to assign as error, trial counsel's ineffectiveness as defense counsel, failed to preserve on the record Chester's no duty to retreat (stand your ground) argument before the trial court and appellate review.

2. Appellate counsel was constitutionally ineffective for failing to assign Chester's
no duty to retreat argument under Ohio Criminal Rule 52(B), plain error.

(*Id*. at Ex. 43) On January 18, 2022, the Supreme Court of Ohio declined to accept jurisdiction of

the appeal pursuant to S. Ct. Prac. R. 7.08(B)(4). (*Id*. at Ex. 44, Case No. 2021-1419).

## IV.   Federal Habeas Corpus Petition

On June 6, 2022, Chester petitioned through counsel that this Court issue a writ of habeas

corpus. (ECF No. 1). Chester asserted the following grounds for relief:

> **GROUND ONE:** Petitioner, Chester's conviction/verdict is Insufficient as a matter of law.
> **Supporting Facts:** In this instant matter, Chester's trial demonstrated that even after viewing the evidence in favor of the prosecution, it is clear that the State of Ohio failed to prove facts to convince the average mind that Petitioner, Chester was guilty of the crimes herein. Chester clearly testified to his fear, ongoing since the February, 2019 M Bar incident where his car was shot up after leaving. The shooter was believed to be Antonio Wallace, who was pointing a gun at Chester in May, 2019 at the R bar incident. The evidence clearly showed that Chester was in fear and was saving his own life when he shot at Antonio Wallace thereby the was insufficient evidence to convict Chester herein.
>
> **GROUND TWO:** Petitioner, Chester's verdict is against the Manifest Weight of the evidence.
> **Supporting Facts:** In this present case, no evidence was introduced that showed who shot Nigel Jackson. No video or eyewitness testimony shows the shooter. No witnesses testified that Chester was the shooter. Chester was one of at least (3) three people with firearms that evening. Records show that Chester was attacked without provocation. Also, that Chester was in fear for his life. Chester had a legal CCW permit, served in the military, no previous criminal record, worked as a mail carrier within the United States post office while being a loving husband and father to three (3) young daughters. All of the foregoing shows that Chester was a law abiding citizen enjoying the evening out with a few friends then all of a sudden, out of the blue, Chester was attacked and chose to Stand his Ground instead of retreating as the New Stand Your Ground Law states, thereby the Verdict herein is against the Manifest the Weight.

**GROUND THREE:** The Trial Court's Sentencing was in error, depriving Petitioner, Chester of his Constitutional and Due Process Rights.

**Supporting Facts:** The trial court erred in sentencing Petitioner, Chester to consecutive sentences in the convictions for felonious assaults. Further, there is no evidence of separate animus on the felonious assault charges against Antonio Wallace and "John Doe". There Is no evidence of separate animus in this matter. Antonio Wallace was pointing a gun at Chester, who was defending himself. Chester never saw or knew of a "John Doe, nor was any "John Doe", ever identified by the State. Therefore, the trial court erred in Sentencing Petitioner, Chester herein.

**GROUND FOUR:** Chester's Appellate Counsel was constitutionally Ineffective for falling to assign as error, Trial Counsel's ineffectiveness as he failed to preserve on the record Chester's No Duty to Retreat Argument.

**Supporting Facts:** Trial counsel failed to preserve on the record Chester's No Duty To Retreat (Stand Your Ground) argument before the Court. In consideration of this case and the highly publicized Stand Your Ground Bill working Its way through the Ohio Legislature as Chester was litigating his case in Ohio's courts. Chester asserts the Ohio's New Stand Your Ground Law shifted the burden of the accused's duty to retreat during a criminal case from the accused having a duty to retreat; to the accused having no duty to retreat under circumstances thereby, changing the question of proof of an individual that was attacked without provocation, legally had a firearm in his possession and was in fear for his life, could use deadly force. Due to Chester's counsels Ineffectiveness, this argument may never get an appellate review.

**GROUND FIVE:** Chester's appellate counsel was constitutionally ineffective for failing to assign Chester's No Duty to retreat Argument under Ohio Criminal Rule 52(B), Plain Error.

**Supporting Facts:** Chester's conviction centered around Chester's failure to retreat away from the incident. The jury accepted the State's assertion that Chester violated his duty to retreat or avoid danger because the state alleges that Chester got away from the scene of the conflict and could have sought police assistance and/or drove away from the conflict. But the jury failed to consider that the attack on Chester was ongoing, putting his life in jeopardy on a daily basis. Therefore, Chester believed he could not retreat and under Ohio New Stand Your Ground Law, Chester would not have been required to retreat considering the facts and circumstances of the case herein. Chester asserts that the record and evidence herein supports his claim that pursuant to Criminal Rule 52(B), (plain error

doctrine) therefore, appellate counsel was ineffective for not assigning the aforementioned ground.

(ECF No. 1 at 9, 11-12, 14, 20).

## V.     Legal Standards

### A.     Jurisdiction

28 U.S.C. § 2254(a) authorizes district courts to entertain an application for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d). The Court of Common Pleas of Stark County sentenced Chester, and Stark County is within this court's geographic jurisdiction. Accordingly, this Court has jurisdiction over Chester's § 2254 petition.

### B.     Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in application of state law … are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of

11

evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th 1998).

### C.    AEDPA Standard of Review

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v.*

*Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id*.

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's … determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

13

For state prisoners, the § 2254(d) standard "is difficult to meet… because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id*. 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state courts decision conflicts with this Court's precedents" and "goes no further." *Id*. Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## VI. Discussion

### A. Ground One

In Ground One, Chester alleges that there was insufficient evidence to convict him. (ECF No. 1 at 6). Respondent argues that Ground One is meritless. This Court agrees with the Respondent.

Chester raised on direct appeal the sufficiency of the evidence to support a guilty verdict on his murder and/or felony murder charge; the state court of appeals ruled as follows:

{¶33} Appellant's first and second assignments of error are related and will be considered together. Appellant argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶34} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is

14

to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶35} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶36} Appellant was found guilty upon one count of murder pursuant to R.C. 2903.02(A) and/or (B). Appellee was therefore required to prove that appellant purposely caused the death of Nigel Jackson, and/or caused Jackson's death as a proximate result of committing or attempting to commit felonious assault.

{¶37} Appellee's case against appellant is largely circumstantial. Ohio law recognizes that circumstantial evidence is sufficient to prove the essential elements in a criminal case. *State v. Scott*, 5th Dist. Morgan No. 06 CA 1, 2007-Ohio-303, ¶ 35, citing *State v. Willey*, 5th Dist. Guernsey No. 98 CA 6, unreported, 1999 WL 3962 (Nov. 24, 1998), internal citation omitted. "The only notable exception to this principle is where the inference between the facts proven and the facts sought to be proven is so attenuated that no reasonable mind could find proof beyond a reasonable doubt." *Id.*, citing *State v. Griffin*, 13 Ohio App.3d 376, 377-378, 469 N.E.2d 1329 (1st Dist.1979).

{¶38} If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Granados*, 5th Dist. Fairfield No. 13-CA-50, 2014-Ohio-1758, ¶ 27, citing *Jenks, supra*, 61 Ohio St.3d at 272, paragraph one of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990), citing

*Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 331, 130 N.E.2d 820 (1955). Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Lott*, 51 Ohio St.3d at 168, citing *Hurt*, 164 Ohio St. at 331.

{¶39} Piecing together the evidence of the videos with the testimony of the witnesses, it is evident appellant initiated the shootout. Appellant stowed a loaded gun in an accessible location—his truck tire well—before he entered a crowded bar. Despite what he described as months of menacing by Wallace, appellant and his cousins chose the bar where Wallace and his "crew" were regulars. Appellant was sucker-punched in the bar shortly after arrival and assumed Wallace was the perpetrator. After leaving the bar and going to his truck, appellant did not leave the scene; instead, he retrieved his firearm and returned to the bar parking lot. Appellant does not dispute firing his weapon in the direction of the perceived threat: Antonio Wallace, Nigel Jackson, and the unidentified third man. Appellant told police he "emptied the clip;" he didn't know how many times he fired but he "just kept squeezing." Appellant was the only known shooter who used a .40-caliber firearm that night. Twelve .40-caliber shell casings fired from the same gun were found around the scene in the aftermath, including one in the bed of appellant's truck.

{¶40} Moore testified he heard shots from the parking lot, saw Jackson start to crumple to the ground, and Wallace still had his hands at his sides. The testimony of one witness, if believed by the factfinder, is enough to support a conviction. See, *State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 133. The video surveillance also corroborated Moore's recollection; Jackson collapsed to his knee before Wallace raised his weapon, and before Moore fired two shots from the door of the bar. Franco also testified Wallace raised his arm after shots were fired from the parking lot.

{¶41} The autopsy provided further evidence appellant killed Jackson. The deputy medical examiner testified that he found fragments of copper-nosed bullets, and one almost-intact copper-nosed bullet, in Jackson's body. The intact copper-nosed bullet was the fatal shot. Appellee's firearms expert testified that only .40-caliber Inceptor bullets are copper-nosed. Appellant was the only shooter that night to fire a .40-caliber weapon, and an Inceptor ammunition box was found under his bed during the consent search.

{¶42} We defer to the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraph one of the syllabus. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Johnson*, 2015-Ohio-3113, 41 N.E.3d 104, ¶ 61 (5th Dist.), citing *State v.*

*Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The jury need not believe all of a witness' testimony, but may accept only portions of it as true. Id.

{¶43} Any inconsistencies in the evidence were for the trial court to resolve. *State v. Dotson*, 5th Dist. Stark No. 2016CA00199, 2017-Ohio-5565, ¶ 49. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *State v. Delevie*, 5th Dist. Licking No. 18-CA-111, 2019-Ohio-3563, ¶ 30, appeal not allowed, 158 Ohio St.3d 1410, 2020-Ohio-518, 139 N.E.3d 927, citing *State v. Brindley*, 10th Dist. Franklin No. 01AP-926, 2002-Ohio-2425, 2002 WL 1013033, ¶ 16.

{¶44} Appellant further argues appellee failed to prove he did not act in self-defense. R.C. 2901.05 provides in relevant part:

> (A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense * * * is upon the accused. (B)(1) A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * * as the case may be.

> * * * *.

> (4) The presumption set forth in division (B)(2) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence, provided that the prosecution's burden of proof remains proof beyond a reasonable doubt as described in divisions (A) and (B)(1) of this section.

{¶45} In the instant case, the jury was instructed as follows:

> * * * *.

> The Defendant is allowed to use force in self-defense. Evidence was presented that, if believed by you, tends to support a finding that the Defendant used deadly force in self-defense. In order to prove that the Defendant did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:

A. The Defendant was at fault in creating the situation giving rise to the death of Nigel Jackson;

Or B. The Defendant did not have reasonable grounds to believe and an honest belief, even if mistaken that he was in imminent or immediate danger of death or great bodily harm;

Or C. The Defendant violated a duty to retreat or escape to avoid the danger; or

D. The Defendant did not use reasonable force.

* * * *.

At Fault: The Defendant did not act in self-defense if the State proved beyond a reasonable doubt that the Defendant was at fault in creating the situation that resulted in the death. The Defendant was at fault if the Defendant was the initial aggressor and

A. Nigel Jackson and/or Antonio Wallace did not escalate the situation to deadly force;

Or B. The Defendant provoked Nigel Jackson and/or Antonio Wallace into using force;

Or C. The Defendant did not withdraw from the situation;

Or D. The Defendant withdrew from the situation but did not reasonably indicate his withdrawal by words or acts to Nigel Jackson and/or Antonio Wallace.

* * * *.

Duty to Retreat: The Defendant has a duty to retreat if he:

A, was at fault in creating the situation giving rise to the death of Nigel Jackson;

Or B. Did not have reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm;

Or C. Had a reasonable means of escape from that danger other than by the use of deadly force.

* * * *.

T. IV., 103-107.

{¶46} Appellant had multiple opportunities to escape the situation giving rise to the danger and not only failed to do so, but escalated the danger. After he was sucker-

18

punched by Jackson, he left the bar and went to his truck. He claimed he couldn't open the door and had no choice but to grab his gun from the wheel well and return to the bar parking lot, actions that defy logic if he sought to avoid the threat of Wallace. Compton was right behind appellant with the truck keys, but he took the gun, ran back to the parking lot, and shot at Jackson, Wallace, and John Doe. We further note that despite alleged months of threats from Wallace, appellant went to the bar with the loaded firearm he secreted in the wheel well and a loaded AK-47 under the seat. As demonstrated at trial, appellant had several options other than returning to the parking lot and killing Jackson. He could have run to the Speedway across the street, or taken cover behind or inside the truck, or run down the road. In short, appellant had no defensible reason to return to the parking lot and empty his weapon in the direction of Jackson, killing him. Appellee's evidence was compelling, and the jury was free to weigh appellant's self-serving testimony of self-defense accordingly. *State v. Spiess*, 5th Dist. Licking No. 19-CA-106, 2020-Ohio-4376, ¶ 27.

{¶47} Viewing the evidence in the light most favorable to appellee, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant was guilty of murder and felonious assault. A reasonable person could further find, beyond a reasonable doubt, that appellant did not act in self-defense. We hold, therefore, that appellee met its burden of production regarding every element of the crimes and, accordingly, there was sufficient evidence to support appellant's convictions.

{¶48} The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. *State v. Zachery*, 5th Dist. Stark No. 2008-CA-00187, 2009-Ohio-715 at ¶ 36. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *Id*., citing *State v. Craig*, 10th Dist. Franklin No. 99AP-739, unreported, 2000 WL 297252 (Mar. 23, 2000), internal citation omitted.

{¶49} Appellant's first and second assignments of error are overruled.

*State v. Chester*, 2021-Ohio-918, ¶¶ 33-49.

The state court of appeals relied on state law, rather than federal law, in addressing the sufficiency of the evidence claim. The state court, however, relied on *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997), and *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) (syllabus), which follow the sufficiency of evidence standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). Thus, the issue is whether the state court decision was an

unreasonable application of clearly established federal law; in other words, whether the state court identified the correct governing legal principle from Supreme Court decisions, but unreasonably applied that principle to the facts of Chester's case. *Williams*, 529 U.S. at 410-412; *Bolton v. Harris*, No. 1:18CV1164, 2021 WL 1930239, at *31 (N.D. Ohio Apr. 7, 2021), *report and recommendation adopted*, No. 1:18 CV 1164, 2021 WL 1929117 (N.D. Ohio May 13, 2021).

Under *Jackson*, a sufficiency of the evidence claim is reviewed by determining whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319; *see also Cavazos v. Smith*, 565 U.S. 1, 7 (2011); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990). The state court correctly identified and applied the governing legal principle as set forth in *Jackson*. *See Chester*, 2021-Ohio-918, ¶¶ 33-49.

On habeas review, "the *Jackson v. Virginia* standard is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.' " *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (*en banc*), *cert. denied*, 566 U.S. 947 (2012) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). The Supreme Court has affirmed that "*Jackson* claims face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 651, 132 S. Ct. 2060, 182 L. Ed. 2d 978 (2012). A federal habeas court may overturn the state court's sufficiency of the evidence decision "only if the state court decision was 'objectively unreasonable.' " *Id*. (citing *Cavazos*, 565 U.S. at 4).

A sufficiency of the evidence claim "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir.), *cert. denied*, 537 U.S. 980 (2002) (quoting *Jackson*, 443 U.S. at 324 n.16). Thus, the federal court must look to state law to determine the elements of the crime. *See Palmer*

*v. Palmer*, No. 1:15-CV-458, 2018 WL 7891722, at *15 (W.D. Mich. Oct. 29, 2018), *report and recommendation adopted*, No. 1:15-CV-458, 2019 WL 1429258 (W.D. Mich. Mar. 29, 2019) (citing *Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements ...."); *Jackson*, 443 U.S. at 324 n.16 ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.").

Chester was found guilty upon one count of murder pursuant to Ohio R.C. 2903.02(A) and/or (B). To be guilty of murder under Ohio R.C. 2903.02(A), the State was required to prove that Chester purposely caused the death of Nigel Jackson; to be guilty of felony murder under Ohio R.C. 2903.02(B), the State was required to prove that Jackson's death as a proximate result of committing or attempting to commit felonious assault. Here, the state court's opinion, quoted above, recounts the evidence that supports a conviction on the elements of murder and/or felony murder. *Chester*, 2021-Ohio-918, ¶¶ 36-42. The state court also addressed Chester's self-defense argument. *Chester*, 2021-Ohio-918, ¶¶ 44-48 (see quoted paragraph above).

Reviewing the state court's determination on these issues, this court cannot find that the state court's decision is an objectively unreasonable application of federal law. The evidence supporting the conviction included several eye-witness testimonies that Chester initiated the shootout. Chester does not deny retrieving his gun from his truck tire well and firing it in the direction of Antonio Wallace and Nigel Jackson. Chester's gun used .40-caliber bullets, twelve .40-caliber shell casings were retrieved around the scene of the shootout – including the bed of Chester's truck, Jackson's autopsy found that he was killed by a copper-nosed bullet, only .40-

caliber Inceptor bullets are copper-nosed, Chester was the only person who shot a .40-caliber weapon that night, and police found an Inceptor ammunition box under Chester's bed during a search of his house. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Chester purposely caused Jackson's death. The state court correctly identified and applied the governing legal principle as set forth in *Jackson.* Moreover, there is sufficient evidence that a reasonable juror could have found that Chester had a reasonable means to escape the situation instead of using deadly force. Chester could have taken cover behind his truck until his cousin – who was right behind him – arrived with the truck keys and then he could have left, or he could have run away from the bar. Instead, Chester retrieved a loaded firearm from his truck and returned to the bar, while shooting at Jackson, Wallace, and a third person. The evidence shows that Chester was the first person to fire. Based on this evidence, a reasonable person could find that appellate did not act in self-defense.

Chester attempts to demonstrate clear error in the facts by submitting a letter from the United States Department of Justice, Northern District of Ohio "verifying his status as a victim from the gang Shorb Blocc and stat[ing] that Chester may be needed as a witness in the Federal Court case against some members of the gang[.]" (ECF No. 11 at 8, 27). However, this Court is barred from considering Chester's new exhibits when reviewing the merits of this ground for relief. *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011),

Accordingly, Chester has failed to demonstrate that the state court determination resulted in a decision that involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

Consequently, Ground One should be denied.

**B.      Ground Two**

In Ground Two, Chester alleges that his convictions were against the manifest weight of the evidence. (ECF No. 1 at 11). Respondent argues that Ground Two is not cognizable. (ECF No. 5 at 13). Chester argues that Ground Two raises a cognizable issue "that his constitutional and due process rights under the United States Constitution were violated by an unfair, improper evidence and/or lack of evidence thereof." (ECF No. 11 at 5).

The Court agrees with the Warden that manifest-weight-of-the-evidence questions do not present federal issues. *See Gulley v. Hall,* No. 5:09-CV-00441, 2010 WL 1438809, at *8 (N.D. Ohio Mar. 22, 2010), *report and recommendation adopted,* No. 5:09CV441, 2010 WL 1438807 (N.D. Ohio Apr. 9, 2010); *see also Steele v. Tambi*, Case No. 1:05-CV-00178, 2007 U.S. Dist. LEXIS 33318, at *38 (N.D. Ohio 2007). It is well-settled that claims regarding the manifest weight of the evidence are state law claims that cannot be reviewed in a federal habeas proceeding. *See, e.g., Walker,* 703 F.2d at 969 (noting that the due process clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence; it provides relief only for those convicted without sufficient proof to allow a finding of guilt beyond a reasonable doubt).

Accordingly, the Court concludes that Chester's Ground Two claim for relief is not cognizable and should be dismissed.

**C.      Ground Three**

In Ground Three, Chester alleges that the trial court erred in imposing consecutive sentences for the felonious assaults. Chester also argues that "[t]here is no evidence of separate animus in this matter." (ECF No. 1 at 12). Respondent argues that Ground Three is not cognizable

because sentencing errors lie beyond the scope of federal habeas review as they involve the application of state statutes and Ohio case law. (ECF No. 5 at 16).

The Court agrees with Respondent that Ground Three is not cognizable. Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in application of state law … are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker,* 703 F.2d at 962); *see also McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen*, 845 F.2d at 614 (citing *Oviedo*, 809 F.2d at 328). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin*, 758 F.2d at 1433).

First, Chester takes issue with the trial court imposing consecutive sentences. He states "[t]here is no evidence the Court applied the three-pronged test for allied offenses of similar import as mandated by *State v Earley,* 145 Ohio St.3d 281, 285, 2015-Ohio-4615, paragraph 11. This weighing was not done by the Court." (ECF No. 11 at 10). Chester argues that this failure is "so egregious" that his sentence "must be overturned to correct the manifest injustice to avoid a further miscarriage of justice." (*Id.* at 11). The application of state sentencing laws governing consecutive sentencing does not present a federal constitutional question but merely an issue of state law which is not cognizable on habeas review. *See Coleman v. Koloski*, 24 Ohio Misc. 183, 415 F.2d 745, 746 (6th Cir. 1969) (breaking and entering sentences running concurrently with each other and

larceny sentences running concurrently with each other but consecutively to breaking and entering sentences involved matter of degree of punishment which, in absence of cruel and unusual punishment, was matter of interpretation for state courts and did not present a federal constitutional question); *see also Nunez v. Brunsman*, 886 F.Supp.2d 765, 770 (S.D. Ohio 2012) (state court's imposition of consecutive sentences for defendant's convictions for two counts of felony murder did not violate defendant's due process rights). Nor does the imposition of consecutive, as opposed to concurrent, sentences amount to cruel and unusual punishment in violation of the federal constitution. *See Barde v. United States*, 224 F.2d 959 (6th Cir. 1955). Because his claim involves the application of a state statutes and state case law, Chester's claim is not cognizable in federal habeas review. *See Smith v. Ohio*, No. 1:02 CV 690, 331 F. Supp. 2d 605, 622 (N.D. Ohio Aug. 26, 2004).

Additionally, Chester argues that because there was no separate animus on the assault charges for Wallace and John Doe, his assault convictions are allied and should have merged for sentencing. (*See* ECF No. 1, PageID #: 12). Whether the trial court erred by not merging Chester's assault convictions as allied offenses, is based on the application of Ohio Revised Code § 2941.25(A). However, whether offenses are allied and therefore merge for sentencing is a matter of state law and not cognizable on habeas review. *Minor v. Wainwright*, No. 19-3206, 2019 WL 2489656, at *2 (6th Cir. June 6, 2019) ("The Ohio courts' handling of its allied offenses statute is not cognizable on federal habeas review.") citing *Jackson v. Smith*, 745 F.3d 206, 214 (6th Cir. 2014).

Accordingly, Ground Three should be dismissed as not cognizable.

### D.  Grounds Four and Five

In his fourth and fifth grounds for relief, Chester alleges that he was denied the effective assistance of appellate counsel because his appellate counsel "failed to preserve on the record Chester's No Duty to Retreat Argument" and "failed to assign Chester's no duty to retreat Argument under Ohio Criminal Rule 52(B), Plain Error." (ECF No. 1 at 14, 20). Respondent argues that the state appellate court reasonably determined that "Chester cannot show that his appellate counsel performed deficiently" or that "but for his appellate counsel's alleged errors, there was a reasonable probability that the result of the proceeding would have been different." (ECF No. 5 at 38). Thus, Respondent argues that "[u]nder the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard, Chester's ineffective assistance of appellate counsel claim fails." (*Id.*).

In considering an ineffective assistance of appellate counsel claim, a habeas court applies the two-part test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Haliym v. Mitchell*, 492 F.3d 680, 694 (6th Cir. 2007). A petitioner must show: "(1) that counsel's performance was objectively deficient; and (2) prejudice, which means that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* To determine whether there was prejudice, the court "assess[es] the strength of the claim appellate counsel failed to raise." *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004) (citations omitted). Thus, a claim appellate counsel could have but did not raise cannot form the basis of an ineffective assistance of counsel claim unless the claim had a reasonable probability of success at the time it could have been raised to have changed the result of the appeal. *Id.* at 699-700. Appellate counsel cannot be ineffective for failing

to raise an issue that lacks merit. *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) (citing *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008)).

Additionally, "the combined effect of *Strickland* and § 2254(d) is doubly deferential review. Put differently, 'the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Hughbanks v. Hudson*, 2 F.4th 527, 543 (6th Cir. 2021) (alterations omitted) (quoting *Foust v. Houk*, 655 F.3d 524, 533-34 (6th Cir. 2011)).

Chester raised claims of ineffective assistance of appellate counsel in his application to reopen. (ECF No. 5-1 at Ex. 39). The state appellate court set out the applicable law and addressed his claims as follows:

> App.R. 26(8) permits a defendant to apply for reopening of an appeal from judgment of conviction and sentence based upon a claim of ineffective assistance of appellate counsel. *See also, State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992). The Ohio Supreme Court has determined the two-prong analysis articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 67 4 (1984) is the appropriate standard for evaluation of a claim of ineffective assistance of appellate counsel. State v. Reed, 74 Ohio St.3d 534, 535, 660 N.E.2d 456 (1996).

> To succeed on a claim of ineffectiveness, a defendant must satisfy a two prong test. Initially, a defendant must show that trial counsel acted incompetently. *See, Strickland, supra*. In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

> "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland, supra,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690. Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

27

We hereby overrule appellant's application to reopen for the following reasons.

### I., II.

Appellant's two proposed assignments of error are related and will be considered together.

Appellant argues appellate counsel was ineffective in failing to argue defense trial counsel was ineffective: defense trial counsel should have preserved appellant's ability to assert the right to use deadly force without regard to the duty to retreat, an argument premised upon legislation pending at the time of trial (SB 175). Appellant was indicted upon multiple charges arising from a shootout at the R Bar; Nigel Jackson was killed and two other individuals were shot at on May 12, 2019. The jury trial commenced on January 7, 2020. Upon direct appeal, appellant argued appellee failed to prove he did not act in self-defense. We reviewed the jury instructions, applied them to the relevant portions of the record, and disagreed. *Chester*, supra at ¶ 44-48.

Ohio's self-defense law under former R.C. 2901.05 placed the burden of going forward with evidence of self-defense, and the burden of proof, on the defendant, with a standard of proof of preponderance-of-the-evidence. To establish self-defense through the use of deadly force, a defendant was required to prove that: {1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) he must not have violated any duty to retreat or to avoid the danger. *State v. Adkins*, 3d Dist. Allen, No. 1-19-71, 2020-0hio-6799, ¶ 23-24.

On March 28, 2019, the Ohio General Assembly's amendments to R.C. 2901.05 became effective, thereby shifting the burden of proof in self-defense claims to appellee, who must now prove beyond a reasonable doubt that an accused did not use force in self-defense. However, the common law elements of self-defense remained the same regardless of the burden shifting nature of R.C. 2901.0S(B)(I). *See, State v. McEndree*, 11th Dist. Ashtabula No. 2019A0038, 2020-Ohio-4526, ¶ 90.

Here, the jury instructions given by the trial court were consistent with these self-defense principles. Furthermore, we have already determined appellant violated his duty to retreat as he had multiple opportunities to escape the situation giving rise to the danger; he not only failed to do so, but escalated the danger.

In SB 175, effective April 6, 2021, the General Assembly approved significant changes in relation to the duty-to-retreat element applicable to the use of deadly force in self-defense, expanding the ability to use force without regard to the necessity to retreat before resorting to such force. This legislation became effective after the instant offenses were committed, after appellant's trial, and after the convictions and sentence were affirmed on direct appeal.

Appellant now asserts defense trial counsel was ineffective for failing to preserve an argument under Ohio's "Stand Your Ground" law by not raising the

issue in the trial court on his behalf. We agree with appellee that appellant's argument lacks merit. Counsel must have a reasonable basis in current law to set forth an argument before the trial court. When there is no basis in current law for counsel to put forth an argument, that counsel does not violate a duty owed to his client in failing to set forth that argument. *State v. Jones (Timothy)*, 8th Dist. Cuyahoga No. 52688, 1987 WL 17892, *3.

At the time of appellant's trial, the common-law elements of self-defense remained the same and appellant maintained a duty to retreat. *McEndree* at ¶ 90. Therefore, regardless of whether the Ohio General Assembly subsequently enacted legislation approving changes in relation to the duty to retreat element of self-defense, the law of the State of Ohio, as it stood at the time of appellant's trial, provided that he had a duty to retreat if he had a reasonable means of escape from danger other than by the use of deadly force.

Moreover, even if trial counsel had raised an argument regarding the legislature's amendment to the duty to retreat element of self-defense, the new law could not be applied retroactively to appellant's case.

To argue that he is entitled to the retroactive application of Ohio's "Stand your Ground" law, appellant relies on a United States Supreme Court case discussing circumstances wherein new rules for the conduct of criminal prosecutions were applied retroactively to a case that was pending on direct review but not yet final. Appellant cites *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), holding that new rules for the conduct of criminal prosecutions must be "applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328. *Griffith* reasoned that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication," and further that "selective application of new rules violates the principle of treating similarly situated defendants the same." *Id.* at 322-323.

The instant case, however, does not involve the recognition of a new constitutional rule, as in *Griffith*. Rather, SB 175 effected a statutory change regarding the manner in which the element of a defendant's duty to retreat, or lack thereof, is regulated at trial in a self-defense claim. The instant case does not involve a constitutional issue nor does it involve the recognition of a new constitutional rule.

Appellant provides no additional support for his argument that SB 175, which was not in effect until over a year after his trial, should be applied retroactively such that his trial counsel should have preserved the issue at trial. "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48; *see Van Fossen v. Babcock Wilcox Co.*, 36 Ohio St.3d 100, 105, 522 N.E.2d 489 (1988). Here, the legislature did not indicate, expressly or otherwise, that SB 175 was to be retroactively applied. By the time SB 175 became effective on April 6, 2021, appellant's convictions had been affirmed by this Court on direct appeal. Appellant's trial counsel did not owe him a duty to raise

29

an issue before the trial court when there was no sound basis in law to do so at the time.

Accordingly, appellant has not demonstrated that appellate counsel was deficient in raising the issue of his trial counsel's ineffectiveness as there was no reasonable probability of success had counsel presented the claim which he now asserts on appeal.

Appellant further maintains that his appellate counsel was ineffective for failing to assign his no duty to retreat argument under plain error on his direct appeal. In doing so, Appellant broadly asserts that "in light of Ohio's new Stand Your Ground law and the facts and evidence of this case, the plain error doctrine could be used to correct the injustices that ha[s] occurred herein." (Application for Reopening, 8.) However, beyond arguing the facts of his case and the evidence presented at trial from his own personal perspective, appellant does little to develop this argument. Appellate counsel is not required to raise and argue assignments of error that are meritless and a refusal to do so simply does not create a genuine issue of ineffective assistance.

We conclude, therefore, appellant's application for reopening fails to raise any substantive issue which would allow us to find a colorable claim of ineffective assistance of appellate counsel. Accordingly, we deny appellant's application to reopen his direct appeal.

(ECF No. 5-1, Ex. 41.)

Chester argues that "his constitutional and due process rights under the United States Constitution were violated by appellate counsel's ineffectiveness as appellate counsel fail[ed] to submit a dead bang winner on appeal." (ECF No. 11 at 16-17). It is clear that Chester emphatically believes that the change in Ohio's Stand Your Ground law causes his conviction to be unjust and fundamentally unfair. (*See id*. at 20-22). Nonetheless, the state appellate court properly determined that the change in the statute was *not* retroactive. *See State v. Brooks*, 170 Ohio St.3d 1, 2022-Ohio-2478, 208 N.E.3d 751, ¶ 10 ("A statute may not be applied retroactively unless the General Assembly expressly makes it retroactive."), citing *Hyle v. Porter*, 117 Ohio St.3d 165, 2008-Ohio-542, 882 N.E.2d 899, ¶ 9. "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48; *Brooks* at ¶ 9. Chester does not argue that the General Assembly expressly stated that the statute is retroactive; nor does he direct the Court to any case law

indicating that the General Assembly intended for the statute to apply retroactively. Instead, Chester merely states that defense counsel "should have [been] aware that a Stand Your Ground Bill was pending before the Ohio Legislature that would support [his] position[.]" (ECF No. 11 at 19). However, Chester does not explain how the State appellate court's determination was contrary to or an unreasonable application of *Strickland*. The court reviewed Chester's assignments of error and determined that he could not demonstrate any prejudice by his appellate counsel refusing to raise meritless issues. The changes to Ohio's stand your ground law were not in effect at the time of the offense nor at the time of Chester's trial. [2] Chester does not direct the Court to any case law showing how the appellate court's decision was contrary to or an unreasonable interpretation of United States Supreme Court precedent. Because Chester cannot demonstrate any prejudice by his appellate counsel not raising claims regarding the then upcoming changes to Ohio's stand your ground laws, he cannot demonstrate the second part of the *Strickland* test. Accordingly, Chester fails to overcome the double and highly deferential standard applicable to the Court's review of his *Strickland* claims as he has not shown that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

---

[2] This issue of whether Ohio's "stand your ground" law (i.e., R.C. 2901.09) applies in situations where the conduct occurred prior to the statute's effective date (i.e., prior to April 6, 2021), but the trial occurred after its effective date is currently pending before the Ohio Supreme Court. *See State v. Degahson*, 2022-Ohio-4617, 168 Ohio St. 3d 1479, 200 N.E.3d 261; *State v. Hurt,* 2022-Ohio-4201, 168 Ohio St. 3d 1457, 198 N.E.3d 869; *State v. Wagner*, 2023-Ohio-773, 169 Ohio St. 3d 1467, 205 N.E.3d 548. Nevertheless, Chester's trial occurred *prior* to the effective date of the new law; thus, the outcome of this issue will have no effect on Chester's argument that his counsel was ineffective for failing to preserve as an issue that the law applies to trial that occurred prior to the law's effective date.

Grounds Four and Five should be dismissed as meritless.[3]

## VII.    Certificate of Appealability

### A.    Legal Standard

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right."). The "'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The granting of a certificate of appealability does not require a showing that the appeal would succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

---

[3] Chester also argues that:

> with a proper and thorough investigation by defense counsel it would have uncovered that Chester had been terrorized by the Shorb Blocc gang and its Associates for a long period of time before the May 12, 2019, incident. Also, the investigation would have uncovered that the Shorb Blocc gang had been spreading its violent acts throughout the Greater Canton area upon the good citizens since a least 2005. Shorb Blocc gang was under investigation and/or accused to committed physical violence and the threats of physical violence, including murder, and assault, against rival gang members, rival drug dealers, law enforcement cooperators, and the good citizens of the Greater Canton, Ohio area. In light of this information that could have been obtained by trial counsel, certainly Chester had good reason to fear for his life."

(*Id.* at 18-19). However, this appears to be a new ground for relief attacking his trial counsel's performance, investigation, and theory of the case. (*See id.* at 19-20). Respondent correctly points out that "[a] traverse or reply to an answer to a habeas petition is not the proper pleading for a habeas petitioner to raise new issues or additional grounds for relief." (ECF No. 13 at 3-4).  Any new issues or grounds for relief presented in Chester's traverse are not properly before this Court. *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005).

### B.     Analysis

Chester's grounds for relief are not cognizable and meritless. If the Court accepts the foregoing recommendation, then Chester has not made a substantial showing of a denial of a constitutional right. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

## VIII.  Recommendation

Chester has presented only meritless and not cognizable claims. Thus, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

DATED: May 16, 2024

    _s/Carmen E. Henderson_____
    Carmen E. Henderson
    United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).